**Mary M. MAGALLANES, Plaintiff-Appellant,**

**v.**

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant-Appellee.**

**No. 88-2593.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1989.

Decided Aug. 4, 1989.

Harvey P. Sackett, San Jose, Cal., for plaintiff-appellant.

Dennis J. Mulshine, Assistant Regional Counsel, San Francisco, Cal., for defendant-appellee.

Before CHOY, WALLACE and WIGGINS, Circuit Judges.

WALLACE, Circuit Judge:

Mary Magallanes appeals from the district court's judgment affirming the determination by the Secretary of Health and Human Services (Secretary) of the onset date of her disability. Magallanes argues that the Secretary's decision awarding her disability benefits but rejecting her claim of an earlier onset date was not supported by substantial evidence. She contends that the administrative law judge (ALJ) improperly disregarded the opinion of her treating physicians, improperly relied on a non-treating, non-examining physician's opinion, failed to make sufficient findings to justify discrediting her subjective pain testimony, and improperly relied on unsupported vocational expert testimony. We have jurisdiction over Magallanes's timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

I

Magallanes was born on August 11, 1941, is married, and has four children.

Her education consists of the completion of the 11th grade and two weeks of training for grocery checking. She worked as a grocery checker for 15 years and as a bank teller for two months.

Magallanes was injured in an automobile accident on February 24, 1983. Following this accident, she attempted to work from June 6 to July 20, 1983, and one day on January 19, 1984. She has not worked since.

On August 11, 1983, Magallanes underwent anterior cervical fusion surgery for pain in her neck, shoulders, and arms. On September 19, 1985, she underwent a second operation, this time a cervical laminectomy, for neck pain.

On August 2, 1983, Magallanes applied for disability insurance benefits, describing her disabling condition as a "neck injury (disc)." An ALJ and the Appeals Council denied her application, and Magallanes sought judicial review. On November 6, 1985, the district court found that although the ALJ's decision was not supported by substantial evidence, there was insufficient evidence to grant summary judgment for Magallanes. The case was remanded for consideration of new evidence and reconsideration of findings.

On remand, the ALJ found that new evidence proved Magallanes was disabled and had been entitled to disability benefits since September 19, 1985, the date of her second operation. The Appeals Council affirmed. Contending that she was disabled as of February 24, 1983, the date of her accident, Magallanes again sought judicial review. The district court granted summary judgment in favor of the Secretary, thus affirming the Secretary's determination of the onset date of Magallanes's disability. Magallanes appealed.

## II

The Secretary's decision to deny benefits " 'will be disturbed only if it is not supported by substantial evidence or it is based on legal error.' " *Brawner v. Secretary of Health & Human Services,* 839 F.2d 432, 433 (9th Cir.1987), *quoting Green v. Heckler,* 803 F.2d 528, 529 (9th Cir.1986); *see* 42 U.S.C. § 405(g). "The same standard applies where the ALJ has awarded benefits and the claimant seeks additional benefits...." *Davis v. Heckler,* 868 F.2d 323, 325–26 (9th Cir.1989) (*Davis*). We review the district court's summary judgment independently. *Gamer v. Secretary of Health & Human Services,* 815 F.2d 1275, 1278 (9th Cir.1987). "Substantial evidence means 'more than a mere scintilla' but 'less than a preponderance.' It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Davis,* 868 F.2d at 326 (citations omitted). To determine whether substantial evidence supports the ALJ's decision, we "review the administrative record as a whole, weighing both the evidence that supports and [that which] detracts from the ALJ's conclusion." *Id., citing Martinez v. Heckler,* 807 F.2d 771, 772 (9th Cir.1986) (*Martinez*). The ALJ is responsible for determining credibility and resolving conflicts in medical testimony. *Allen v. Heckler,* 749 F.2d 577, 579 (9th Cir.1984) (*Allen*). The ALJ is likewise responsible for resolving ambiguities. *See Vincent on Behalf of Vincent v. Heckler,* 739 F.2d 1393, 1394 (9th Cir.1984) (*Vincent*); *see also Thorne v. Schweiker,* 694 F.2d 170, 172 (8th Cir.1982) ("It is for the ALJ to resolve ... ambiguities in the evidence."); *Weber v. Harris,* 640 F.2d 176, 178 (8th Cir.1981) (same). We must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Gallant v. Heckler,* 753 F.2d 1450, 1453 (9th Cir.1984) (*Gallant*); *Allen,* 749 F.2d at 579. The question before us is whether the onset date actually chosen is supported by substantial evidence, not whether another date could reasonably have been chosen. *See Swanson v. Secretary of Health & Human Services,* 763 F.2d 1061, 1065 (9th Cir.1985). The burden of proof rests upon the claimant. *Sanchez v. Secretary of Health & Human Services,* 812 F.2d 509, 511 (9th Cir.1987).

## III

Magallanes raises several arguments to challenge the ALJ's determination that the

onset date of her disability was September 19, 1985. Her primary contention is that the ALJ failed to give sufficient reasons to justify disregarding the medical testimony of two treating physicians, Dr. Pont and Dr. Fox, that she was disabled as of 1983. She contends that the results of a new test performed in June 1985 demonstrate the absence of substantial evidence to support the ALJ's decision and that the ALJ improperly relied on the opinion of a non-treating, non-examining physician who testified at the ALJ's request. She also contends that the ALJ made inadequate findings to justify rejecting her subjective pain testimony, that the ALJ improperly relied on her ability to perform housework in reaching his decision, and that the ALJ's decision improperly relied on incomplete and improper hypothetical questions posed to a vocational expert.

A.

Magallanes points to the opinions of two treating physicians, Drs. Pont and Fox, that she has been disabled since 1983. She suggests that the ALJ improperly disregarded their testimony.

We begin with a review of the law governing the opinion of treating physicians in disability cases. We afford greater weight to a treating physician's opinion because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen,* 812 F.2d 1226, 1230 (9th Cir.1987) (*Sprague*). The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability. *Rodriguez v. Bowen,* 876 F.2d 759, 761–62 & n. 7 (9th Cir.1989) (*Rodriguez*). The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted. *See id.; Cotton v. Bowen,* 799 F.2d 1403, 1408 (9th Cir.1986) (*Cotton*). For example, the ALJ need not accept a treating physician's opinion which is "brief and conclusionary in form with little in the way of clinical findings to support [its] conclusion." *Young v. Heckler,* 803 F.2d 963, 968 (9th Cir.1986). To reject the uncontroverted opinion of a claimant's physician, the ALJ must present clear and convincing reasons for doing so. *Rodriguez,* 876 F.2d at 761–62; *Montijo v. Secretary of Health & Human Services,* 729 F.2d 599, 601 (9th Cir.1984).

To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must " 'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.' " *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir.1987) (*Winans*), *quoting Sprague,* 812 F.2d at 1230; *see also Murray v. Heckler,* 722 F.2d 499, 502 (9th Cir.1983) (*Murray*) (adopting this rule). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton,* 799 F.2d at 1408. The rule established by *Murray* does not apply, however, "when the nontreating physician relies on independent clinical findings that differ from the findings of the treating physician." *Miller v. Heckler,* 770 F.2d 845, 849 (9th Cir.1985) (*Miller*); *Allen,* 749 F.2d at 579. " '[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence. . . .' " *Miller,* 770 F.2d at 849 (brackets in original), *quoting Allen,* 749 F.2d at 579. Where medical reports are inconclusive, " 'questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary.' " *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir.1982) (*Sample*), *quoting Waters v. Gardner,* 452 F.2d 855, 858 n. 7 (9th Cir. 1971).

1.

Dr. Pont, one of Magallanes's treating physicians, stated in a July 1985 letter to Magallanes's attorney that he believed that Magallanes had been "disabled since August, 1983 from any reasonable wage earning occupation." The ALJ rejected this opinion based on the claimant's own testimony, and the opinions and evidence from Dr. Sigurdson, Dr. Auerbach, Dr. Meadow,

and Dr. Hanbery. The ALJ relied primarily on Dr. Auerbach's June 1984 report.

Dr. Auerbach, an orthopedic surgeon, examined Magallanes on June 7, 1984. Dr. Auerbach exhaustively reviewed Magallanes's medical records from other physicians, which form part of the record here. Consistent with those other records, Dr. Auerbach found that Magallanes had "the residuals of the injury of 2–24–83 and the subsequent surgery," but saw "no evidence of active or chronic nerve root irritation on objective examination or EMG studies into either upper extremity." He did find limitation of neck motion. After reviewing records indicating uncertainty whether the anterior cervical fusion surgery had in fact created a fusion at C5–6, he concluded, "I do not believe that the patient needs any further surgery for her problem. I do believe that there is most probably a fusion at C5–6."

Dr. Auerbach also considered Magallanes's subjective complaints of pain in the neck, shoulders, and arms. He recommended, nevertheless, that she "be encouraged to return to to some type of gainful employment," but with designated restrictions. He stated that "[s]he could do work involving sitting and standing. She could not do work involving repetitive looking up or down or repetitive looking from side to side and would have difficulty doing a job involving lifting repetitively with her arms." He did not believe that she could return to a job as a grocery checker. He later expressed doubts that she could work as a bank teller because of the "repetitive long standing and looking forward with the neck flexed," as well as the need to lift items such as money sacks or heavy files. He stated again, however, that she could handle sitting and standing, and looking occasionally from side to side.

The ALJ stated, and Magallanes does not dispute, that the limitations identified in Dr. Auerbach's June 1984 report "were consistent with the limitations discussed by the various examining physicians based on objective signs and findings in the medical evidence from the time of [Magallanes's] February 1983 injury." Other consistent evidence predating Dr. Auerbach's report includes the report of Dr. Floyd, a non-treating orthopedist who examined Magallanes in December 1983. Dr. Floyd reported Magallanes's pain as "intermittent" and "slight to moderate," observing that she could walk, sit, and stand without difficulty. Similarly, Dr. Hanbery, the head of neurosurgery at Stanford University Medical Center, found no neurological abnormalities when he examined Magallanes in April 1984. He observed a full range of motion in her shoulders, and only a "slight restriction in left lateral rotation of the cervical spine." Earlier evidence consistent with Dr. Auerbach's report includes the opinion of Dr. Troy, a treating physician and Board certified orthopedist, who diagnosed Magallanes's strain as relatively mild and reported that she had no problem standing or walking. Dr. Sigurdson, a Board certified orthopedic surgeon, served as a non-treating, non-examining medical adviser at the ALJ's request. He testified at the May 1, 1986, hearing that the limitations identified by Dr. Auerbach were consistent with "the objective signs and findings in the medical evidence."

Magallanes challenges the ALJ's reliance on Dr. Sigurdson's testimony to reject the opinion of her treating physicians. She points to our statement that " '[a] report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record.' " *Gallant,* 753 F.2d at 1454, *quoting Millner v. Schweiker,* 725 F.2d 243, 245 (4th Cir.1984). Here, however, Dr. Sigurdson's opinion is not contradicted by *all other evidence* in the record; it is consistent with other evidence, particularly that contained in Dr. Auerbach's report. Indeed, the ALJ did not rely on Dr. Sigurdson's testimony *alone* to reject the opinions of Magallanes's treating physicians as to the onset date of her disability. Furthermore, the reports of consultative physicians called in by the Secretary may serve as substantial evidence. *See Allen,* 749 F.2d at 580; *cf. Richardson v. Perales,* 402 U.S. 389, 402–03, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971) (such written reports are neither hearsay be-

cause written, nor biased and are admissible). The assistance to the ALJ of such consultative physicians is obvious and we refuse to exclude such evidence, whether offered in writing or in person. The analysis and opinion of an expert selected by the ALJ may be helpful to the ALJ's adjudication, and we should not impose "burdensome procedural requirements that facilitate ... second-guessing [the ALJ's resolution of conflicting medical testimony]." *Allen,* 749 F.2d at 580.

Magallanes also suggests that Dr. Sigurdson's testimony was equivocal as to the onset date determined by the ALJ. To the extent that Dr. Sigurdson's testimony was equivocal or even supported Magallanes's position, it was the responsibility of the ALJ to consider it along with other conflicting evidence and opinion testimony in reaching his conclusion. "It is not necessary to agree with everything an expert witness says in order to hold that his testimony contains 'substantial evidence.'" *Russell v. Bowen,* 856 F.2d 81, 83 (9th Cir.1988) (citation omitted). The ALJ was aware of the bases for Dr. Sigurdson's testimony, and as previously observed, his comments were supported by objective medical evidence.

Magallanes points next to medical evidence not available until June 1985. Magnetic resonance images (MRI's) of Magallanes's cervical spine were obtained through nuclear magnetic resonance, also called magnetic resonance imaging. The record indicates that this was relatively new technology. Dr. Mills, the clinical director of magnetic resonance imaging, found that Magallanes's MRI revealed "[h]erniation of the C4–5 disc posteriorly and to the right side," with possible "bony osteophytes," and "[f]usion at C5–6 with posterior osteophytes impressing the anterior subarachnoid space and displacing the cervical spinal cord posteriorly." Dr. Pont reviewed the MRI films and generally agreed with these findings, but stated that he did not believe there was "impression on the cervical cord in any fashion by bony structures," a conclusion "corroborated by the patient's absolute absence of any myelopathic findings or symptoms." Dr. Pont also reexamined Magallanes in July 1985, finding pain and limitation of movement in the neck and shoulder, and "cervical spasm in the paraspinous area." He expressed the opinion that she was totally disabled, had been since August 1983, and would remain so for six to nine months "due to her persistent and constant pain factors" in the neck and shoulder.

Dr. Hanbery saw Magallanes in August 1985. Dr. Hanbery had examined her previously in April 1984, and then expressed doubts about Dr. Norman's opinion that the fusion at C5–6 was not solid. In a letter dated August 9, 1985, Dr. Hanbery agreed with Dr. Pont's conclusion that Magallanes had both a neck problem and a shoulder joint problem, but added that he was "not very impressed with any of the findings on the MRI scan." He stated that he saw no evidence of spinal cord compression and doubted whether there was compression of the right 5th cervical nerve root at C4–5. He recommended against further surgery and suggested that Magallanes try to live with her neck discomfort and concentrate on her shoulder joint problem.

Our review indicates that the ALJ met the necessary burden for rejecting Dr. Pont's opinion that Magallanes was disabled as of August 1983. Because this opinion was contradicted by the evidence set forth above, to the extent that other physicians' opinions rested on clinical findings also considered by Dr. Pont, the ALJ was required to set forth "specific, legitimate reasons ... based on substantial evidence in the record." *Sprague,* 812 F.2d at 1230, *quoting Murray,* 722 F.2d at 502; *see also Miller,* 770 F.2d at 849. The ALJ could meet this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton,* 799 F.2d at 1408. To the extent that other physicians' conflicting opinions rested on independent, objective findings, those opinions could constitute substantial evidence. *See Miller,* 770 F.2d at 849. The ALJ found that the medical evidence prior to September 1985 consist-

ently supported Dr. Auerbach's report of Magallanes's limitations. The new evidence from summer 1985 (including the MRI) established no further limitations. The critical factor rendering Magallanes disabled was, the ALJ found, her disabling *back* impairment. The ALJ specifically found that no objective medical signs and findings prior to September 1985 established such an impairment. This explanation is sufficiently specific and legitimate to rebut Dr. Pont, and is supported by substantial evidence in the record. It is consistent with Magallanes's own subjective pain testimony, as discussed later, and the vocational expert testimony, as discussed later. The ALJ accepted all of Dr. Pont's objective medical findings, but refused to accept his conclusion that before September 1985 Magallanes's restrictions precluded her from performing any work whatsoever.

2.

Dr. Fox, another treating physician, stated that he believed that Magallanes had been disabled ever since the accident occurred in February 1983. Dr. Fox first saw Magallanes in September 1985, and first expressed this opinion in August 1986. Dr. Fox performed a cervical laminectomy on September 19, 1985, and examined Magallanes several times afterwards. In December 1985, he described her progress after surgery as "excellent," and stated that she was "doing beautifully" with "very minimal complaints of headache, neck or shoulder or arm pain, but only a few little twinges of pain periodically in the right arm." To prevent recurrence of muscle spasm and pain, he felt that Magallanes should be restricted from "[l]ifting, twisting, bending with the neck and shoulders and arms ... as well as any stressful occupation requiring mental concentration." By April 1986, Dr. Fox described Magallanes's condition as only fair, with low back pain in addition to her previous symptoms, and recommended the same restrictions. By August 1986, his prognosis was even more guarded, with a recommendation of further surgery to correct a herniated lumbar disc.

The ALJ accepted Dr. Fox's reports, and specifically found that they were supported by "objective signs and findings in the medical evidence." Nonetheless, the ALJ rejected his opinion that Magallanes had been disabled since February 1983. Because Dr. Fox's opinion was contradicted, we evaluate the ALJ's rejection of his opinion by the same standard we applied to the rejection of Dr. Pont's opinion. Again, our review indicates that the ALJ met the necessary burden. We observe initially that Drs. Pont and Fox themselves disagreed whether the onset date was August or February of 1983. The ALJ explained that until September 1985, the medical evidence and Magallanes's own subjective pain complaints were consistent with Dr. Auerbach's report. Substantial evidence supports this explanation. The critical factor rendering Magallanes disabled, her disabling back impairment, was not supported by objective medical signs and findings until September 1985. As discussed later, this date is also consistent with Magallanes's subjective pain testimony.

Dr. Fox had no direct personal knowledge of Magallanes's condition prior to September 1985, and was thus scarcely different from any non-treating physician with respect to that time period. His retrospective opinion was contradicted by the findings and opinions of several doctors who did have the opportunity to examine Magallanes during that time period. Since Dr. Floyd, Dr. Auerbach, and Dr. Hanbery found no disabling condition when they examined Magallanes in late 1983, 1984, and as late as August 1985, the ALJ reasonably found their reports more persuasive than Dr. Fox's conjecture. *See Vincent,* 739 F.2d at 1395 (discounting retrospective psychiatric opinion).

Relying on *Stone v. Heckler,* 761 F.2d 530, 532 (9th Cir.1985), for the proposition that the most recent medical report is the most probative, Magallanes suggests that Dr. Fox's report should be especially probative because it is more recent than those others *and* it comes from a treating physician. *Stone* applies where a claimant's condition is progressively deteriorat-

ing, and the ALJ is attempting to determine whether a claimant is disabled *at all. See id.* at 532. Where a claimant's condition becomes progressively worse, medical reports from an early phase of the disease are likely to be less probative than later reports. Here, however, we are examining not whether Magallanes is disabled, but whether the ALJ's choice of onset date was reasonable. The rationale underlying *Stone* simply does not apply to our inquiry.

It is true that the ALJ did not recite the magic words, "I reject Dr. Fox's opinion about the onset date because...." But our cases do not require such an incantation. As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion. It is proper for us to read the paragraph discussing Dr. Pont's findings and opinion, and draw inferences relevant to Dr. Fox's findings and opinion, if those inferences are there to be drawn. For the ALJ to credit other physicians' opinions resting on clinical findings also considered by Dr. Fox, we require specific and legitimate reasons based on substantial evidence in the record. *Winans,* 853 F.2d at 647; *Miller,* 770 F.2d at 849. This standard was met by the ALJ's specific and legitimate explanations. The ALJ here summarized the facts and conflicting clinical evidence in detailed and thorough fashion, stating his interpretation and making findings. *See Cotton,* 799 F.2d at 1408. We therefore conclude that there was substantial evidence supporting the ALJ's decision rejecting Dr. Fox's opinion as to the onset date of Magallanes's disability.

B.

We turn next to Magallanes's subjective pain complaints. Where objective medical findings establish the existence of medical impairment, but a claimant testifies that she experiences pain at a higher level, the Secretary is free to disbelieve that testimony. The Secretary must, however, make a specific and justifiable finding that the claimant's testimony is not credible. *Varney v. Secretary of Health & Human Services,* 859 F.2d 1396, 1399 (9th Cir.1988); *Cotton,* 799 F.2d at 1407. The claimant's pain need not be the inevitable result of the objective medical impairments; the pain need only be associated with such an impairment. *Hammock v. Bowen,* 867 F.2d 1209, 1213–14 (9th Cir.1989).

This case differs from our excess pain cases in one important respect: the ALJ credited Magallanes's subjective back pain testimony, but rejected her conclusion that this pain rendered her unable to engage in substantial gainful employment of any kind. In fact, the ALJ relied heavily on Magallanes's subjective complaints about back pain in determining the onset of disability. As previously discussed, the ALJ decided that while Magallanes's neck movement and lifting problems precluded her return to her former work as a grocery checker, she could perform other kinds of work despite this pain. It was her *lower back pain* that finally rendered her disabled from all other kinds of work. Magallanes testified that before September 1985 she felt only slight back pain, going back three or four months, and she first mentioned this back pain to her doctors in September 1985. She never mentioned back pain at her first hearing on July 19, 1984. The ALJ specifically made these points and contrasted the "reasonably active life" she led at the time of the first hearing with the very restricted life she (and her husband) described as beginning in September 1985. The ALJ also pointed out the absence of objective medical findings or evidence of a disabling back impairment prior to September 1985. Thus, even if Magallanes had claimed severe lower back pain at this time, there were no associated objective findings to support such a claim. *See id.* at 1213 ("claimant must submit objective medical findings establishing medical impairments that 'could reasonably be expected to produce the pain' "), *quoting* 42 U.S.C. § 423(d)(5)(A); *see also* 20 C.F.R. § 404.1529 (1988) (same); Social Security Ruling 88–13 (issued July 20, 1988, but effective August 20, 1980) (same).

Magallanes complains that the ALJ improperly relied on testimony from her and her husband discussing her de-

creased level of household activity after her September 1985 surgery. She points to our cases which explain that a claimant need not " 'vegetate in a dark room' " or "be a total 'basket case' " to be found unable to engage in substantial gainful activity. *Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir.1987) (*Cooper*), *quoting Smith v. Califano,* 637 F.2d 968, 971 (3d Cir.1981); *Vidal v. Harris,* 637 F.2d 710, 713 (9th Cir.1981), *quoting Timmerman v. Weinberger,* 510 F.2d 439, 442 (8th Cir.1975). Evidence that a claimant can assist in housework is not determinative of disability. *Cooper,* 815 F.2d at 561. Our review of the record does not suggest that the ALJ relied solely on this testimony in flagrant disregard of overwhelming medical evidence to the contrary. Our cases do not prevent the ALJ from taking into account a claimant's level of activity, along with other probative evidence of disability or lack thereof.

Magallanes's claim that the ALJ improperly disregarded her subjective pain testimony is thus without merit.

C.

We next consider Magallanes's contention that the hypothetical questions posed by the ALJ to the vocational expert at Magallanes's second administrative hearing were incomplete and improper.

"If a claimant shows that he or she cannot return to his or her previous job, the burden of proof shifts to the Secretary to show that the claimant can do other kinds of work." *Embrey v. Bowen,* 849 F.2d 418, 422 (9th Cir.1988) (*Embrey*). The Secretary must show that the claimant can perform other types of substantial, gainful work that exists in the national economy; specific reference should be made to realistic job opportunities. *Sample,* 694 F.2d at 643. "Without other reliable evidence of a claimant's ability to perform specific jobs, the Secretary must use a vocational expert to meet that burden. Hypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant...." *Embrey,* 849 F.2d at 422 (emphasis in original) (citations omitted). The testimony of a vocational expert "is valuable only to the extent that it is supported by medical evidence." *Sample,* 694 F.2d at 644. The vocational expert's opinion about a claimant's residual functional capacity has no evidentiary value if the assumptions in the hypothetical are not supported by the record. *Embrey,* 849 F.2d at 422.

Dr. Meadow, a vocational expert, testified at Magallanes's second administrative hearing, which occurred on May 1, 1986. The ALJ posed the hypothetical of a woman in her early to mid-40s, 11th grade education, subject to the restrictions set forth in Dr. Auerbach's June 7, 1984, report. Dr. Meadow made clear that he understood these restrictions involved "repetitive lifting, repetitive bending of the neck, [and] use of the arms," and identified such jobs as sales clerk in a store, ticket-taker, telephone credit worker, and non-typing receptionist. He stated that these jobs existed in significant numbers in the regional and national economy.

Magallanes does not dispute that Dr. Meadow's opinion properly applies Dr. Auerbach's report. Rather, she contends that the ALJ's hypothetical was improper because it failed to reflect all her limitations as reflected in Dr. Fox's April 23, 1986, report. Dr. Fox's report states that "lifting, twisting, and bending with the neck, shoulders or arms ... should be discouraged as well as any stressful occupation involving mental concentration.... [Magallanes] is unable to do any occupation lasting for more than ½ hour. She is unable to sit, stand or walk for more than ½ hour." Dr. Meadow testified in response to questioning by Magallanes's counsel that with these restrictions, Magallanes would be precluded from doing any of these jobs.

The ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel. *Martinez,* 807 F.2d at 773. Rather, the ALJ is "free to accept or reject these restrictions ... as long as they are sup-

ported by substantial evidence." *Id.* at 774. This is true even where there is conflicting medical evidence. *Id.* The limitation of evidence in a hypothetical question is objectionable "only if the assumed facts could not be supported by the record." *Sample,* 694 F.2d at 644; *see also Embrey,* 849 F.2d at 422 (assumptions in hypothetical must be supported by the record); *Martinez,* 807 F.2d at 774 (same). For reasons already given, the restrictions contained in the ALJ's hypothetical based on Dr. Auerbach's report are amply supported by the record, and therefore the ALJ properly relied on Dr. Meadow's testimony in determining Magallanes's residual functional capacity. *See Sample,* 694 F.2d at 644.

AFFIRMED.